UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VALVTECHNOLOGIES, INC., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. H-10-3943 |
| | § | |
| ROBERT B. NORTH, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION**
(Preliminary Injunction)

**I.    INTRODUCTION**

Before this Court are the proposed findings of fact and conclusions of law of the plaintiffs', Valvtechnologies, Inc., ("VTI") and Rhinoite, Inc., ("Rhinoite") [Doc. No. 21] and the defendants' Robert B. North and Northmonte Limited, Inc., [Doc. No. 22] provided pursuant to the plaintiffs' application for a preliminary injunction.  The Court received testimony, documentary evidence and the arguments of counsel on October 25, 2010 and January 6, 2011, and now, having reflected on these matters, determines that the VTI and Rhinoite's motion for a preliminary injunction should be granted.

**II.   FACTUAL BACKGROUND**

The defendant, North, is the owner of United Stats Patent numbers 6,117,493 ['493] and 6,582,126 ['126].  Both inventions boast of "improving the wear resistant properties of mental parts and in particular, the erosion resistance of those parts due to sand, rock and other debris entrained in fluids passing across the surfaces of those parts.  "[The] invention[s] have particular application to improving the surface properties of bearings and rotors such as are used in down

hole motors or alternatively in turbines." *See* [Patents-Background of The Invention. Para. 1 '493 and '126].

On or about March 30, 2006, North entered into an Employment Agreement for a term of three years and a Patent License Agreement for the same period that gave an exclusive license to VTI concerning the '493 and '126 Patents. The Patents describe a process for making a steel bearing member having an erosion resistant surface – the '493 Patent, and the process for making a radical bearing having an erosion resistant surface – the '126 Patent.

North came on board VTI as an employee, after negotiations, and received an annual salary of $60,000, plus fringe benefits such as healthcare, vacations and reimbursement of expenses incurred in the exercise of his employment duties. During his employment, North was to assist VTI in making and selling products that were generated from the patented processes. On June 16, 2010, well past the three-year term of the Agreement and License, North resigned his employment with VTI. However, his right to convert the exclusive license issued to VTI from exclusive to non-exclusive had already ended.

In addition to the terms of employment and compensation, the parties also included provisions covering confidentiality of information, restrictive covenants, license matters and enforcement. Concerning the License Agreement, it provided expiration dates and covered the possibility of an acquisition of Northmonte Partners, L.P.[1] One or more of the restrictive covenants in the two Agreements is presumed to survive the expiration date of North's employment. There surviving restrictive covenants form, in part, the substance of the parties' remaining disputes.

---

[1] The License Agreement with VTI is actually between VTI, Robert B. North individually and Northmonte Partners, L.P., an entity once owned by North and Ross Tremonte. VTI acquired Tremonte's interest in Northmonte Partners, LP, which partnership owned the '493 and '126 Patents. Currently, North owns 50% of the partnership, VTI owns 49% and Northmonte 1%. North is the sole owner of the '582 Patent and Northmonte Limited, Incorporated.

### III. CONTENTIONS OF THE PARTIES

VTI and the defendants offered the testimony of three witnesses, *i.e.,* VTI's Vice-President of Operations, its Chief Financial Officer and the defendant, Robert B. North. VTI moved to dismiss or remove from consideration any claims that it was making against North relating to the Employment Agreement. For this proceeding, VTI is going forward on its claim(s) of patent infringement as it seeks to enforce exclusive use of the processes defined in the '493, '582 and '126 Patents. Initially, North entered into an agreed Temporary Restraining Order that was extended to the conclusion of the Court's resolution of these proceedings.

North asserts that he is the owner of the Patents, and because VTI has not used the patented process except to do overlays on elbows, t-sections, bearings and choke tubes, he should not be barred from using his invention on blades, centerfuges, crusher teeth and other applications for down-hole drilling. North argues that VTI is not in this line of work and, therefore, he should not be excluded from this application. VTI counters that the Court should not look to products that might be or not manufactured by it but to the process that is required to make the product. In this vain, VTI argues that North's use of the Licensed Process is infringement.

### IV. ADDITIONAL FINDINGS OF FACT

1. Section 9(a) of the Employment Agreement stated that the Patent License "shall be deemed canceled and terminated" if North's employment ended before the initial three year period. Because North remained employed at VTI well past the initial three year period, the Patent License could not have terminated pursuant to section 9 of the Employment Agreement.

2. There was only one other contingency to the exclusive Patent License. Pursuant to section 2.1 of the Patent License, "Three years after the Effective Date, this exclusive license becomes non-exclusive for any Licensed Products or Licensed Processes that VTI has not used."

3. Testimony during the January 6, 2011, hearing established that VTI had made and sold the Licensed Products, and had used the Licensed Processes, before March 30, 2009. The testimony also established that North admitted that VTI had made and sold the Licensed Products, and had used the Licensed Processes, while he worked for VTI.

4. Therefore, pursuant to section 2.1 of the Patent License, on March 31, 2009, North's right to convert the exclusive Patent License to a non-exclusive license terminated. VTI became the permanent exclusive licensee of the Patents, with no further contingencies against VTI being the exclusive licensee of the Patents. Accordingly, VTI is the exclusive licensee of the Patents.

5. In addition to all common-law duties regarding the employer-employee relationship between North and VTI, the Employment Agreement included specifically tailored and reasonable restrictive covenant provisions that restricted North from disclosing VTI's confidential information to third parties, soliciting VTI customers and suppliers, soliciting VTI's employees, soliciting transactions, competing with VTI, and disparaging VTI.

6. On September 24, 2010, after North resigned his employment at VTI, and acting both in his individual capacity and as President of Northmonte, Limited, North sent a letter to Kubota Metal Corporation, stating that it could be "subject to penalty for ... patent infringement" referring to the processes of the '493 and '126 Patents. And, again on October 7, acting both in his individual capacity and as President of Northmonte, Limited, North sent a letter to ExxonMobil, stating that if ExxonMobil wished to use the process covered by the Patents, they should contact him.

7.  Section 9(b) of North's Employment Agreement listed the following four actions that VTI and North agreed to take in the event North was still an employee after three years:

> 9(b) In the event that the Term of Employment is not terminated prior to the completion of the initial three year period, the Company and Employee hereby covenant and agree to take, or cause to be taken, the following actions:
>
> (i)   Formation of a new entity with equity ownership and board representation (or other equivalent management representation) to be allocated 60% to the Company and 40% to Northmonte, LP (or other entity wholly-owned by Robert North and Ross Tramonte).
>
> (ii)  Execution of a Shareholders Agreement with respect to the new entity (or equivalent arrangement if a non-corporate entity) containing customary transfer restrictions and capital contribution and distribution provisions. The Shareholders Agreement shall also contain restrictive covenants and proprietary developments provisions applicable to Northmonte Partners, L.P., Robert North and Ross Tramonte on substantially the same terms as set forth in Sections 7 and 8 of this Agreement.
>
> (iii) The Shareholders Agreement shall provide the Company with an option, exercisable at its sole discretion, to purchase the 40% equity ownership of Northmonte Partners, L.P. (or other entity wholly-owned by Robert North and Ross Tramonte) at a price equal to fair market value determined as of the date three years from the date hereof.
>
> (iv)  The Company shall contribute and assign to the new entity the Company's rights under the License. Employee shall cause the Licensors under the License to approve such assignment.

8.  North has presented no evidence that he presented VTI with the legal documents to form the new entity listed in section 9(b)(1) of the Employment Agreement, or with legal documents constituting any form of a Shareholders Agreement listed in section 9(b)(2) of the Employment Agreement

9.  On January 20, 2011, VTI presented the defendants with the necessary legal documents to form the required new entity, and to fully comply with North's Employment Agreement. *See* Exhibit 9, [the email presenting those documents to the defendants' lawyer]. Those documents

included a Certificate of Formation, a Shareholders Agreement proposed Bylaws, and an Assignment from VTI of VTI's rights under the Patent License to the new entity. On January 21, 2011, VTI received the Certificate of Filing from the Texas Secretary of State for the new entity ("Rhinoite Inc.") that had been required by North's Employment Agreement be formed by the parties to that contract.

10. The parties do not dispute that, on January 13, 2011, pursuant to section 15 of North's Employment Agreement, the parties unsuccessfully attempted to mediate their disputes involving the Employment Agreement. Moreover, in section 10 of the Employment Agreement, North agreed that even a threatened breach of the Agreement, including the restrictions against solicitation of VTI's customers, would cause irreparable harm to VTI, and would entitle VTI to injunctive relief.

## V.     CONCLUSIONS OF LAW

1. Because Mr. North remained employed at VTI more than one year past the initial three year period, the Patent License could not have terminated, and did not terminate, pursuant to section 9 of the employment agreement. Therefore, section 2.1 of the Patent License controls North's right to convert the exclusive Patent License to a non-exclusive license ended. On March 31, 2009, VTI became the permanent exclusive licensee of the Patents, with no further contingencies against VTI being the exclusive licensee of the Patents. And, on January 20, 2011, Rhinoite, Inc., because the exclusive licensee of the Patents.

2. North received adequate consideration for his assignment of the Patents, as set forth in his Patent License to VTI. And, although he has argued that VTI has failed to comply with certain terms of the Employment Agreement, those allegations, even if true, are irrelevant to the Patent License.

3. Both North and Northmonte Limited, have infringed, and are now infringing one or more claims of the Patents, by selling, offering to sell, manufacturing, and/or using, within the United States, the Licensed Products and the Licensed Processes. *See* [35 U.S.C. § 271]. As well, the defendants have induced and are actively inducing the infringement of, and have contributorily infringed and continue to contributorily infringe, one or more claims of the Patents by (a) causing, urging, encouraging and/or aiding others to infringe the Patents within the United States, and/or (b) making, using and/or selling within the United States one or more components, materials or apparati for use in practicing the inventions claimed in the Patents. Defendants will continue such unlawful conduct unless enjoined by this Court. *See Id.*

4. The defendants' infringement is willful and deliberate, given that North had actual notice of the existence of the patents and his own conduct in relation to the Patents. As a result of this infringement, VTI's reputation in the marketplace has been injured and will continue to be injured unless the defendants are enjoined by this Court. Hence, the Court is of the opinion that the harm is irreparable.

5. North's conduct also constitutes a breach of the Employment Agreement. These breaches have also injured VTI's reputation in the marketplace, and are continuing in nature. The Court concludes that these breaches have also injured VTI in other respects, all of which injuries are irreparable. These irreparable injuries to VTI will continue unless the defendants are enjoined by this Court.

6. The defendants, by selling, offering to sell, manufacturing, and/or offering to license one or more of the Patents, have willfully and intentionally interfered with these contracts. Additionally, Defendants, by disclosing VTI's confidential information to third parties, soliciting VTI customers and suppliers, soliciting VTI's employees, soliciting transactions, competing with

VTI, and disparaging VTI, have willfully and intentionally interfered with VTI's contracts. There is a reasonable probability that VTI would have entered into business relationships with certain parties within the relevant market including customers or business partners. By selling, offering to sell, manufacturing, and/or offering to license one or more of the Patents, have willfully and intentionally interfered with these relationships.

7. As a result, the defendants, their agents, servants, employees, and all other persons in privity or acting in concert with defendants, should be enjoined during the pendency of this action from (1) all efforts to sell or offer to sell any products or processes covered by the claims of the Patents; (2) all efforts to license any of the Patents, or to license the use of any products or processes covered by the claims of the Patents; (3) all efforts to solicit, contract for, or collect royalties as a result of licensing the Patents or any products or processes covered by the claims of the Patents; (4) all efforts to communicate with, solicit, or enjoin customers (or business partners with which Valvtechnologies, Inc., has a current or potential business relationship), and all employees, agents, or attorneys of such customers, regarding the Patents or any products that incorporate the processes covered by the claims of the Patents; (5) all efforts to manufacture products using the processes covered by the claims of the Patents; and (6) all efforts to solicit, contract for, or obtain manufacturing services from any third party to manufacture products using the processes covered by the claims of the Patents. *See Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974).

The plaintiffs' request for a preliminary injunction meets the criteria for determining whether a preliminary injunction will be granted. In order to be entitled to a preliminary injunction VTI must establish:  (1) a substantial likelihood that the plaintiff will prevail on the merits; (2) a substantial threat that irreparable injury will result if the injunction is not granted;

(3) that the threatened injury outweighs the threatened harm to defendants; and (4) that granting the preliminary injunction will not disserve the public interest. *Id.*

8. Based on this Court's application of the law to the evidence presented in the January 6, 2011, hearing and based on the actions of the parties subsequent to that hearing, there is a substantial likelihood that VTI will prevail on the merits. Hence, if VTI's application for a preliminary injunction is not granted, there is a substantial threat of irreparable injury, because, as shown in the hearing on January 6, 2011, the defendants' actions have already resulted in important customers of VTI being concerned that they might be infringing the Patents, thus damaging VTI's reputation.

9. The harm that will result if the preliminary injunction is not issued is irreparable, because VTI's business relies upon (a) the maintenance of its relationships with its current customers and business partners regarding VTI's rights under the Patents, as well as (b) its marketing that is directed to prospective customers and business partners regarding the Patents.

10. The threatened injury outweighs the threatened harm to defendants, because the defendants have no ongoing business, no manufacturing capacity, and has presented no evidence that they have investors who have invested money to enable them to engage in manufacturing using the patented processes. Moreover, granting the preliminary injunction will not disserve the public interest, because the public has a strong interest in enforcing the rights of the exclusive licensees of patents. Thus, a preliminary injunction should issue. *See Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

Additionally, based on section 10 of his Employment Agreement with VTI, North, agreed that even a threatened breach of the employment contract, including the restrictions against his solicitation of VTI's customers and suppliers, would cause irreparable harm to VTI, and would

entitle VTI to injunctive relief, Mr. North individually should be enjoined until June 16, 2013. *See* Exhibit 4, Para. 7(c-f).

## VI. CONCLUSION

The evidence shows that North agreed that any breach of the Agreements would cause irreparable harm to VTI and that VTI would be entitled to injunctive relief. *See* [VTI, Exhibit P5, Paragraphs 7(c-f)]. Hence, the Court concludes that VTI should be, and is hereby, granted a preliminary injunction and the Court grants same by separate order.

It is so Ordered.

SIGNED at Houston, Texas this 10th day of February, 2011.

_____
Kenneth M. Hoyt
United States District Judge